IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No.10-cv-01625-MSK-MEH

MICHAEL BRODSKY,

      Plaintiff,

v.

CITY AND COUNTY OF DENVER, a Municipal Corporation,
WILLIAM A. LOVINGIER, Ex Officio Sheriff, Denver County,
D/S DIGGINS, Deputy Sheriff, Denver County,
V. CONNORS, Deputy Sheriff, Denver County,
G. McCAIN, Deputy Sheriff, Denver County,
D/S AUSTIN, Deputy Sheriff, Denver County,
D/S BURKE, Deputy Sheriff, Denver County,
D/S PETRONELLI, Deputy Sheriff, Denver County,
D/S JOHN DOE I, Deputy Sheriff, Denver, County,
DENVER HEALTH AND HOSPITAL SYSTEMS, a Private Corporation,
CARMEN K., an Individual Employee of Denver Health,
F. BAUER, an Individual Employee of Denver Health,
JOHN DOE III, an Individual Employee of Denver Health,
DON DOE, an Individual Employee of Denver Health,
JACK DOE, an Individual Employee of Denver Health,
SUSAN ROE, an Individual Employee of Denver Health,
PAM ROE, an Individual Employee of Denver Health,
KEINA ROE, an Individual Employee of Denver Health,
RENEE ROE, an Individual Employee of Denver Health ,and
JANET ROE, an Individual Employee of Denver Health,
(Individually and in their Official Capacities),

      Defendants.

---

## OPINION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT, MAGISTRATE JUDGE RECOMMENDATION, AND OTHER PENDING MOTIONS

---

**THIS MATTER** comes before the Court on:

(1) Plaintiff Michael Brodsky's Objection (**#86)** to a Minute Order (**#71)** issued by

Magistrate Judge Michael E. Hegarty;

(2) the Motion for Summary Judgment (#**102**) filed by Defendants Denver Health and Hospital Systems, Carmen Kassatly, and Francis J. Bauer (collectively "Hospital Defendants"), to which Mr. Brodsky filed an untimely response (#**146**) and the Hospital Defendants replied (#**155**);

(3) the Magistrate Judge's Recommendation (#**145**) that Mr. Brodsky's Motion for Leave to file an Amended Complaint (#**114**) be denied;

(4) the Hospital Defendants' Motion for Order to Show Cause Why Any Response Plaintiff Files to Motion for Summary Judgment Should Not Be Denied (#**117**), to which no response has been filed;

(5) the Hospital Defendants Second Motion for Summary Judgment (#**139**), to which Mr. Brodsky responded (#**149**) and the Hospital Defendants replied (#**154**);

(6) the Motion for Summary Judgment (#**141**) filed by Defendants City and County of Denver ("Denver"), D/S Diggins, V. Connors, D/S Austin, and D/S Petranilli (collectively "Denver Defendants"), to which no response has been filed; and

(7) the Motion to Strike Response to Motion (#**150**), to which Mr. Brodsky responded (#**156**).

Having considered the same, the Court **FINDS** and **CONCLUDES** the following.

## I.   Jurisdiction

The Court exercises subject matter jurisdiction pursuant to 28 U.S.C. § 1343 and 42 U.S.C. § 1983.

## II.   Background

Mr. Brodsky is an incarcerated state prisoner.  He asserts a number of claims based on

purported civil rights violations by the defendants during his detention at the Denver County Jail ("Jail") from approximately April 30, 2009 to October 8, 2009.[1]  His claims, as asserted in the Amended Prisoner Complaint (#**8**) fall into three general categories[2]: (1) Eighth Amendment claims against the Hospital Defendants for failure to provide adequate medical treatment relating to dental problems; (2) a variety of Eighth Amendment and other constitutional claims asserted against the Denver Defendants, particularly relating to the conditions of his confinement while at the Jail; and 3) state law tort claims asserted against all of the Defendants.

Because resolution of the Motions for Summary Judgment assists in the determination of the other pending issues, these motions are addressed first.  The material facts relating to each set of Defendants, as presented in the parties' submissions, are set forth, followed by the pertinent legal analysis for each set of Defendants.  For the purposes of the Motions for Summary Judgment only, the evidence is construed in the light most favorable to Mr. Brodsky.

### III.   Standard of Review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if

---

[1]He was thereafter transferred to the Colorado Department of Corrections ("CDOC") to serve a sentence of incarceration.

[2]The Court is mindful that Mr. Brodsky is proceeding *pro se* and, therefore, the Court construes Mr. Brodsky's pleadings liberally and holds Mr. Brodsky to a "less stringent standard" than pleadings drafted by lawyers in accordance with *Haines v. Kerner*, 404 U.S. 519, 520 (1972).  Such liberal construction is intended merely to overlook technical formatting errors, poor writing style, and other defects in the party's use of legal terminology, citation, and theories.  *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  The Court, however, cannot act as a *pro se* litigant's legal advocate, and a *pro se* plaintiff retains the burden to allege sufficient facts to state a viable claim.  Furthermore, *pro se* status does not relieve a party of the duty to comply with the various rules and procedures governing litigants and counsel or the requirements of the substantive law, and in these regards, the Court must apply the same standard to counsel licensed to practice law and to a *pro se* party.  *See McNeil v. United States*, 508 U.S. 106, 113 (1993); *Ogden v. San Juan County*, 32 F.3d 452, 455 (10th Cir. 1994).

no trial is necessary.  *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).

Summary adjudication is authorized when there is no genuine dispute as to any material fact and

a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Substantive law governs

what facts are material and what issues must be determined.  It also specifies the elements that

must be proved for a given claim or defense, sets the standard of proof and identifies the party

with the burden of proof.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986);

*Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).  A factual

dispute is "genuine" and summary judgment is precluded if the evidence presented in support of

and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter

for either party.  *See Anderson*, 477 U.S. at 248.  When considering a summary judgment

motion, a court views all evidence in the light most favorable to the non-moving party, thereby

favoring the right to a trial.  *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir.

2002).

When the movant has the burden of proof on a claim or defense, the movant must

establish every element of its claim or defense by sufficient, competent evidence.  *See* Fed. R.

Civ. P. 56(e).  Once the moving party has met its burden, to avoid summary judgment the

responding party must present sufficient, competent, contradictory evidence to establish a

genuine factual dispute.  *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th

Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999).  If there is a genuine

dispute as to a material fact, a trial is required.  If there is no genuine dispute as to any material

fact, no trial is required.  The court then applies the law to the undisputed facts and enters

judgment.

When the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove.  If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required.  If the respondent fails to produce sufficient competent evidence to establish its claim or defense, the claim or defense must be dismissed as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

### IV.   Hospital Defendants' Motion for Summary Judgment (#102)

**A.   Material Facts**

The claims against the Hospital Defendants[3] arise from Mr. Brodsky's complaints about a broken or lost filling which he reported immediately upon intake at the Jail.[4]  Mr. Brodsky's medical screening occurred on or around April 30, 2009; the intake form notes that he had a root canal and that he reported pain.  On the same day, he submitted an "Inmate Request for Medical Assistance," which describes the nature of his complaint as follows: "Had a root canal done w/a temporary filling.  Filling wore/fell out.  Needs new one."  **#102-1**, 4 of 25.

---

[3] According to the Complaint, the claims are asserted against various nurses who worked at the Jail, all of whom are named as Roe or Doe defendants and have apparently not been served, against Francis Bauer DDS, one of the dentists who provided treatment, against Carmen Kassalty, who supervises the nursing staff, and against Denver Health and Hospital System ("Denver Health"), which is the entity employing the medical staff at the Jail.  As discussed further below, Mr. Brodsky seeks to file an Amended Complaint in which he would identify the Roe and Doe defendants by name.  He also seeks to add Defendant Lovingier and the City and County of Denver as additional defendants on the grounds that they were aware of the inadequate medical treatment for inmates at the Jail but failed to address the problems.

[4] According to medical records submitted by the Hospital Defendants, Mr. Brodsky was seen at the Jail in March 2004 regarding a broken filling on tooth #30; he was given a temporary filling and told that the tooth might need to be extracted.  Mr. Brodsky does not dispute that the dental problem underlying his claims in this regard goes back to 2004.

Apparently nothing was done for several months;  Mr. Brodsky avers that he submitted additional requests for medical assistance in May and June requesting dental treatment but there is no record of the requests.

### 1.    Reports of Infection and Treatment

In early July,  Mr. Brodsky began experiencing acute pain from the missing filling.  An inmate request for medical assistance dated July 1, 2009 shows that he reported the following: "This is my third kite requesting to see a dentist.  I've lost a temporary filling after having a root canal.  I've been @ the jail since April, the tooth is decaying and becoming painful.  What must I do to be seen." **#102-1**, 10 of 25.  The notes in response show that he was seen the following day, on July 2, 2009.  He was examined and was referred to the next available appointment with the dentist.

On July 4, 2009, Mr. Brodsky submitted another request for medical assistance, which states: "I have a medical EMERGENCY and need help now!  I have an untreated dental condition that has become excruciatingly painful.  I've submitted numerous kites and never been seen.  The gums around my tooth are red & swollen. I believe the tooth is abscessed." **#102-1**, 11 of 25.  The notes indicate he was seen by medical staff the same day, examined, and the provider noted no indication of infection or drainage; the note also states that Mr. Brodsky "is not taking Motrin BID consistently missing AM dose[5]." *Id.*  He was prescribed 1000 mgs of Tylenol for seven days; it was noted that there was an appointment with the dentist on July 7, 2009.

On July 5, 2009, Mr. Brodsky submitted another request, in which he stated: "Need to

---

[5]Mr. Brodsky disputes that he failed to take his painkillers.

see dentist ASAP.  The right side of my face is swollen, and I'm in pain."  **#102-1**, 12 of 25.

According to the notes, he was seen the same day and examined; the notes state "Has swelling in

R jaw, Ø drainage out of tooth, Ø swelling in gums at this time.  Pt is taking Motrin + Tylenol

also antibiotics PCN[6].  Is on dental line to be seen 7/7/09 . . . Not in any acute distress at this

time."  *Id.*  On July 6, 2009, Mr. Brodsky submitted another request, stating "Swelling is worse-

now in my neck.  Extremely painful.  Need to see a doctor."  **#102-1**, 15 of 25.

Mr. Brodsky was seen by the dentist, Defendant Bauer, on July 7, 2009.  The swelling

was noted, as was the existing prescription for penicillin.  The infection was incised and drained.

Dr. Bauer prescribed additional painkiller, specifically Vicodin.  According to Mr. Brodsky, Dr.

Bauer told him he could not provide further treatment at the Jail and that it would be difficult to

get him to the hospital for additional care.  A note dated July 8 indicates that Mr. Brodsky stated,

"I saw the dentist yesterday.  I feel much better.  I don't need anything."  **#102-1**, 16 of 25.

## 2.      Follow-up Treatment

Although Dr. Bauer's treatment had some effect in addressing Mr. Brodsky's condition,

Mr. Brodsky continued to have symptoms and issues.  On July 12, 2009, Mr. Brodsky submitted

another request for assistance, requesting additional penicillin and noting continued pain. **#102-

1**, 17 of 25.  In response to this request, he was given another appointment with Dr. Bauer.

According to the notes of that appointment, dated July 21, 2009, Dr. Bauer informed Mr.

Brodsky that the tooth might need to be extracted; "Pt. Will let me know what he decides: may

want RC [root canal] after release; no pain/swelling."  **#102-1**, 21 of 25.  Mr. Brodsky asserts

that Dr. Bauer told him that the tooth could be saved with a root canal, filling and crown but that

---

[6]"PCN" appears to refer to penicillin.

such procedures were not available at the Jail, the only treatment he could offer was an extraction.

It appears that Mr. Brodsky met with Defendant Kassatly on August 3, 2009 to discuss the responses by the nurses to his requests for treatment and other issues. According to notes of the visit, Mr. Brodsky requested a root canal, filling and crown. Ms. Kassatly explained that the Jail is only a temporary facility and could not provide that treatment but that he need not be in pain and his comfort was important until he was released from the facility. The notes state that his expected release date was September 21, 2009. Ms. Kassatly noted that he would continue to be given painkillers, that another dental appointment would be made to review the need for a temporary filling, and other efforts would be made to monitor and treat his condition. According to Mr. Brodsky, Ms. Kassatly also stated she would review the responses by the nurses to his complaints of pain.

According to notes from a follow up visit with the dentist on August 11, Mr. Brodsky decided he wanted to keep the tooth; he was therefore given a temporary filling. Mr. Brodsky suspects that the procedure was not done correctly and that this led to another infection. Mr. Brodsky filed another request for assistance on August 15, 2009, which contained the following information: "Jaw pain/swelling. Tooth may have gotten reinfected." **#102-1**, 18-25. It appears that he was scheduled for a doctor visit on August 17, 2009, regarding another issue but raised the dental problem. At that visit, the doctor prescribed penicillin again and Mr. Brodsky was scheduled to see the dentist again. Notes of a visit with the dentist dated August 19 show that Mr. Brodsky had mild swelling, had been on penicillin for two days, and wanted to save the tooth. The treatment noted that if the swelling continued, the tooth should be extracted or a

prescription for another antibiotic, Clindamycin, should be given.  **#102-1**, 23 of 25.  Mr. Brodsky was again told that the facility would not provide a root canal and crown.  Mr. Brodsky received a prescription for Clindamycin and began taking it.

Mr. Brodsky states that his symptoms continued and that he submitted another request for medical assistance on August 28, 2009 and was seen by a nurse on August 31, 2009.  Again, the nurse treated him with antibiotics as well as hydrogen peroxide rinses.  The nurse saw Mr. Brodsky again on September 9, 2009 and again referred him to the dentist; the prescription for Clindamycin was also renewed.  Mr. Brodsky states that he was seen by the dentist on the same day and advised that other than a final round of antibiotics, no further treatment would be provided until his transfer.  Mr. Brodsky was transferred to CDOC for his long term confinement around October 8, 2009; he received a root canal and filling at CDOC on June 3, 2010.

**B.      Analysis**

Mr. Brodsky asserts a number of constitutional and state law tort claims against the Hospital Defendants based on the treatment and alleged lack of treatment for his dental problems while at the Jail.  He contends that the infection and pain he suffered were the result of the Hospital Defendants' inaction or inadequate treatment and that the Hospital Defendants were generally not responsive to his requests.  Specifically, he asserts violations of the Eighth Amendment as well as negligence and malpractice claims; he also asserts derivative failure to train and supervise claims.   The Hospital Defendants move for summary judgment as to all of the claims.

**1.      Eighth Amendment - Inadequate Medical Care**

As the plaintiff in this case, Mr. Brodsky has the burden to establish by a preponderance

of the evidence the elements of his claims asserted pursuant to the Eighth Amendment.  The relevant law is as follows.

The Eighth Amendment requires jail officials "to provide humane conditions of confinement by ensuring inmates receive the basic necessities of adequate food, clothing, shelter, and medical care and by taking reasonable measures to guarantee the inmate's safety." *Barney v. Pulsipher*, 153 F.3d 1299, 1310 (10th Cir. 1998).  It is well established that prison officials violate the Eighth Amendment if their "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal quotation marks omitted).  However, a claim based on "an inadvertent failure to provide adequate medical care" or alleging "that a physician has been negligent in diagnosing or treating a medical condition" does not state a valid claim of medical mistreatment under the Eighth Amendment.  *Kikumura v. Osagie*, 461 F.3d 1269, 1291 (10th Cir. 2006) (citations omitted). "Rather, 'a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.'" *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006) (quoting *Estelle*, 429 U.S. at 106).

To demonstrate an Eighth Amendment violation, an inmate must satisfy both objective and subjective elements.  The objective component is met if the deprivation is "sufficiently serious," i.e., one that "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001) (quoting *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999)).  Delay in providing medical care can also support an Eighth Amendment claim, if the plaintiff can show that the delay resulted in substantial harm.  *Id.* at

1276.  That substantial harm can be the ultimate physical injury caused by the prisoner's illness or condition or an intermediate injury, such as the pain experienced while waiting for treatment. *Kikumura*, 461 F.3d at 1292.

The subjective component of the deliberate indifference test is met if the defendant "knows of and disregards an excessive risk to inmate health or safety."  *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000).  A prison medical professional who  "knows that his role in a particular medical emergency is solely to serve as a gatekeeper for other medical personnel capable of treating the condition" may be held liable under the deliberate indifference standard if that person delays or refuses to fulfill that gatekeeper role.  *Id.* at 1211.  "Deliberate indifference" does not require a showing of express intent to harm, rather, it is enough that the official acted or failed to act despite his or her knowledge of a substantial risk of serious harm. *Mata v. Saiz*, 427 F.3d 745, 752 (10th Cir. 2005) (citations omitted).

### a.    Serious Medical Condition

A threshold issue is whether Mr. Brodsky has come forward with sufficient evidence to establish that he suffered from a serious medical condition.  The simple loss of his temporary filling does not demonstrate a serious medical condition.  However, he also complained of extensive pain and swelling which indicated the existence of an infection in Mr. Brodsky's tooth or root that began in early July 2009.   For purposes of further analysis, the Court will assume that the swelling and pain constituted a serious medical condition.

### b.    Deliberate Indifference

Mr. Brodsky, however, also is required to come forward with evidence to demonstrate that the medical personnel were deliberately indifferent to his condition or reports of pain.  Mr.

Brodsky's primary complaint is that Dr. Bauer and other Jail medical staff did not permit him to get a root canal before he was transferred to a permanent facility and, during the acute period of his infection from approximately July 4 to 6, the nurses did not permit him to see a dentist before his scheduled appointment on July 7 or provide him with what he considered to be adequate treatment.

Mr. Brodsky's evidence with respect to Dr. Bauer's treatment include criticism of Dr. Bauer's decision not to do a filling on that first visit, the adequacy of Dr. Bauer's temporary filling (which Mr. Brodsky contends caused re-infection), and the general inadequacy of the treatments provided as compared to a root canal.  These disputes demonstrate nothing more than Mr. Brodsky's disagreement with how Dr. Bauer treated his condition, not deliberate indifference to a serious medical condition.  *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir.1999) ("a prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation.").  The Court takes particular note that Mr. Brodsky contends that he needed an immediate root canal and filling, yet these procedures were not done at CDOC for nearly eight months after his transfer.  Mr. Brodsky has offered no evidence to show that any injury he received as a result in the delay in getting the root canal was due to the three to four month delay at the Jail, as opposed to the eight month additional delay at CDOC.

Mr. Brodsky's deliberate indifference argument as to the individual nurses is that they did not give him prompt treatment whenever he requested it, particularly during the acute period of his infection.  Mr. Brodsky's claims against Ms. Kassatly are for failure to train and supervise the nurses and for failure to "refer him for constitutionally adequate care of his tooth."  Mr.

Brodsky asserts that the nurses "ignored" his requests and did not provide him with the care he believed he should have received.  Construing Mr. Brodsky's Complaint[7] and response brief liberally, the evidence for this appears to be that when Mr. Brodsky made verbal complaints or requests to the nurses he was told to submit a kite, or written request for medical attention.  Mr. Brodsky does not dispute that he received a response to his written requests for medical assistance (other than those for which there is no record, which were submitted in May and June, before there was any serious medical condition) and treatment was provided.  Mr. Brodsky also asserts that the nurses also did not comply with the facility's protocols; again, however, this demonstrates only a dispute regarding what treatment is best, not deliberate indifference to a serious medical condition.

Even construed most favorably to Mr. Brodsky, this evidence is insufficient to make a prima facie showing of deliberate indifference.   It is undisputed that Mr. Brodsky was seen by medical providers in response to his complaints of pain and need for medical/dental treatment, often the same day.  He received pain medicine to address his complaints of pain and antibiotics to treat the infection in his tooth.  The infection was treated and, thereafter, a temporary filling was provided until he was transferred to a facility where he could obtain more permanent relief.  Mr. Brodsky was also offered, but declined, an extraction of his tooth to alleviate the issues presented.  Mr. Brodsky's disagreement with how Dr. Bauer and the nurses exercised their judgment about how to address Mr. Brodsky's medical issues simply does not establish that the Hospital Defendants knew of and disregarded an excessive risk to inmate health or safety.

---

[7]Because Mr. Brodsky's Complaint contains a declaration under penalty of perjury that the information contained therein is true and correct, to the extent his statements appear to be based on personal knowledge the Court will treat the Complaint as an affidavit.

13

Because Mr. Brodsky has not demonstrated deliberate indifference necessary for a Eighth Amendment violation, his claims asserting municipal or entity liability based on the alleged violation also fail.  Summary judgment is granted in favor of the Hospital Defendants and against Mr. Brodsky on these claims.

## 2.        State Law Claims

The Hospital Defendants move for summary judgment on Mr. Brodsky's state law claims on the grounds that he did not comply with the statutory prerequisites for asserting such claims.[8] However, having determined that Mr. Brodsky's federal law claims fail, the Court declines to exercise supplemental jurisdiction over his state law claims against these defendants.  Mr. Brodsky's state tort claims against the Hospital Defendants are therefore dismissed for lack of subject matter jurisdiction.  Pursuant to C.R.S. § 13-80-111, Mr. Brodsky has ninety days after the termination of this case to refile these claims in state court.

In summary, the Hospital Defendants' Motion for Summary Judgment is granted with respect to the Eighth Amendment claims and denied without prejudice with respect to the state law claims.  The state law claims are dismissed without prejudice to refiling in state court.  Since this disposes of Mr. Brodsky's claims against these defendants, the Hospital Defendants' Motion for Order to Show Cause Why Any Response Plaintiff Files to Motion for Summary Judgment Should Not Be Denied (#**117**), Second Motion for Summary Judgment (#**139**), and Motion to

---

[8]The Colorado Governmental Immunity Act ("CGIA") waives sovereign immunity for certain types of claims asserted against public employees, including tort claims arising out of the operation of a correctional facility or jail.  C.R.S. § 24-10-106(1)(b).  However, under the CGIA, a prerequisite to any action against a public entity or employee is the filing of a written notice within 180 days after the date of the discovery of the injury.  C.R.S. § 24-10-109(1).  Mr. Brodsky offers evidence showing that he submitted a letter to Denver Health within the statutory time period, which may or may not qualify as proper notice under the statute.

Strike Response to Motion (#**150**) are denied as moot.

### V.   Denver Defendants' Motion for Summary Judgment (#141)

**A.     Material Facts**

Mr. Brodsky asserts a number of state law and federal civil rights claims relating generally to the conditions of his confinement while at the Jail and several other discrete incidents.  Because he has not filed a response to the Denver Defendants' Motion for Summary Judgment,[9] his asserted facts are taken from his Prisoner Complaint to the extent they are based on his personal knowledge.

### 1.     Arrest, Intake, and Housing Assignments

Mr. Brodsky was arrested on or around April 26, 2009 on charges of aggravated motor vehicle theft and parole violation; after a short stay in another facility he was received at the Jail on April 30, 2009.  As part of his intake, he was issued an inmate handbook (which describes the Jail's grievance procedures as well as how to access programs offered at the Jail), toiletries, clothing and shoes, a blanket, sheets, and a mattress.  He was given a medical and mental health screening and assigned a classification and housing.

Mr. Brodsky was housed in the general population.  Mr. Brodsky was first assigned to Building 9B, which has dormitory-type arrangements, *i.e.*, numerous bunks within three housing areas.  Because of this arrangement, Building 9 is often quite noisy.  On August 31, 2009, he was moved to Building 8A, which contains separate cells.  On September 22, 2009, he was moved to

---

[9]Mr. Brodsky is responsible for complying with this Court's rules regarding timely responses to motions.  He has filed notices indicating he has reviewed the Court's docket and is aware of the filings in the case.  Since he has not requested an extension of time to respond to the motion and the time for filing has expired, no response brief will be accepted.

Building 22, also with separate cells, as well as a common area where inmates eat.  He remained in Building 22 until September 30, 2009.  On that date he was moved to Building 6.  While at Building 6 he was placed for a short period in isolation (less than 24 hours) for observation based on a nurse's recommendation after he was sentenced to a 54 year period of incarceration. On October 7, 2009 he was transferred back to Building 9 and released into the custody of the Department of Corrections on October 8, 2009.

### 2.  Facts Specific to Mr. Brodsky's Claims

#### a.  General Conditions of Confinement

Mr. Brodsky contends that the conditions of his confinement at the Jail violated his civil rights due to the overcrowding, poor ventilation and sanitation, inadequate food, noise, danger from other inmates, size, poor lighting, inability to participate in religious services or vocational programs, lack of bedding, and lack of water and other particular hardships while he was in isolation.

In particular, Mr. Brodsky contends that he contracted tuberculosis while at the Jail.  This is based on his assertion that his tuberculosis test on May 1, 2009, just after his intake at the Jail, was negative but that after his transfer in October 2009 to CDOC he tested positive for the disease.  It is the Jail's policy and practice to test all inmates for tuberculosis in the initial medical screening; inmates testing positive for tuberculosis are placed in special housing units away from the general population of the Jail.  There is no evidence that Mr. Brodsky was housed with any person with tuberculosis or any evidence regarding any outbreaks of tuberculosis or similar issues at the Jail.  With respect to general sanitation, inmates in all buildings are responsible for cleaning their living areas.  Cleaning assignments are scheduled several times a

day and cleaning supplies provided.

Mr. Brodsky also contends he suffered malnutrition and lost weight (from 172 lbs on intake to 161 lbs upon release) despite eating every meal. According to the health assessment done at the time, Mr. Brodsky is 5 feet 11 inches in height and weighed 166.4 pounds at the time of his admission. Inmates at all buildings are given three meals a day and the menu is reviewed to ensure a balanced and nutritional diet is provided.

### b. Retaliation

Mr. Brodsky filed two grievances on August 29, 2009 relating to the conditions of his confinement in Building 9, particularly the noise. Two days later, on August 31, 2009, he was transferred to Building 8, which he contends was in retaliation for his grievances. The Denver Defendants assert that the transfer was in response to Mr. Brodsky's complaints of noise.

Mr. Brodsky claims that by being assigned to Building 8 he was denied certain privileges, such as participation in self help programs and religious services, and that his access to outdoor recreation and the law library was reduced. The Denver Defendants provide evidence that Mr. Brodsky's reassignment from Building 9 to Building 8 should not have affected these privileges. Specifically, inmates in all of the housing assignments are permitted regular outdoor recreation, weather permitting. Inmates at all housing units to which Mr. Brodsky was assigned have the same library access. Similarly, none of the housing assignments affected Mr. Brodsky's ability to attend religious service and self help programs assuming he signed up and space was available; Mr. Brodsky also had the option of requesting individual study or counseling time with the chaplain.

Mr. Brodsky filed another grievance regarding his living conditions in Building 8 on

September 16, 2009; that grievance also contained his contention that his housing assignment had been changed in retaliation for his August grievances.  He contends that on September 24, 2009, Deputy Petranilli conducted a search of Mr. Brodsky's cell and informed him the search had been ordered in response to a grievance.  No contraband was found but Mr. Brodsky asserts that the search left his cell "in disarray."  Deputy Petranilli stated in a discovery response that the search of the cell was a random search and not one specifically requested for any particular reason.

### c.      "Soccer" Game

Mr. Brodsky bases several claims against John Doe defendants based on an incident occurring on August 13, 2009.  He contends that as he was being taken to the medical unit to take prescribed medicine, two deputies in the Jail's main corridor were kicking a basketball "back and forth over a considerable distance."  One of the deputies kicked the ball and it hit Mr. Brodsky on the right side, which caused him pain and anxiety.  Mr. Brodsky did not file a grievance with respect to this incident.  Mr. Brodsky reported this incident to Deputy Lawrence Austin, the floor sergeant at Building 9 at the time, who investigated but did not see anyone kicking a ball as described by Mr. Brodsky.  No further action was taken.

### d.      Comment from Defendant Burke

Mr. Brodsky asserts several civil rights and state law claims against Deputy Burke based on a comment he made on July 5, 2009.  Mr. Brodsky was walking back to his housing unit when Deputy Burke asked by Mr. Brodsky's significant face swelling, caused by his infected tooth.  Deputy Burke "then advised the Plaintiff should obtain a sharp object with which to poke the swelling and drain it."  Prisoner Complaint, **#8**, at 34.  This comment shocked and upset Mr.

Brodsky but he did not file a grievance with respect to this incident.

### e.      Grievance System

Mr. Brodsky asserts that he submitted grievances on July 31, August 14, September 7, September 10, September 14, 2009, and September 25, 2009 to Division Chief Elias Diggins and/or Sheriff Lovingier but that these the persons "in each case ignored or knowingly neglected to respond thereto or to offer any relief." Prisoner Complaint, **#8**, at 35. The Denver Defendants present evidence in the form of an affidavit that the Jail's records show that no grievances addressed to these individuals were received in accordance with the procedures outlined in the inmate handbook.

### f.      Classification

Several claims are based on Mr. Brodsky's assertion that he was placed in inappropriate housing units while at the Jail and that his requests for transfers were denied. He also contends he was unjustifiably placed in segregation, apparently for his own safety, for reporting a threat from his cellmate. He provides no specific information as to why the housing assignments were improper or any particular harm that resulted from these assignments. The Denver Defendants have presented evidence that Mr. Brodsky's housing assignments were consistent with his classification and that his cellmate was also within the same classification.

### g.      Failure to Train and Supervise

To the extent that his claims are based on the conduct of individual deputies, Mr. Brodsky also asserts supervisory claims against Defendant Lovingier, the former Sheriff, and Division Chief Diggins for failure to train and supervise.

### B.      Analysis

With respect to Mr. Brodsky's constitutional claims, the Denver Defendants move for summary judgment on several grounds, including (1) failure to exhaust; and (2) Mr. Brodsky's inability to show any constitutional violation.  As to Mr. Brodsky's state law claims, the Denver Defendants contend that Mr. Brodsky did not file a timely notice of claims pursuant to Colorado statute.

### 1.        Failure to Exhaust

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires that a prisoner exhaust all available administrative remedies prior to filing an action regarding prison conditions in federal court.  Demonstration of exhaustion, however, is not a pleading requirement, but instead must be plead as an affirmative defense by the Defendants.  *See Roberts v. Barreras*, 484 F.3d 1236, 1240-41 (10th Cir.2007) (*discussing Jones v. Bock*, 549 U.S. 199 (2007)).  To exhaust administrative remedies in the prison system, an inmate must properly follow all of the steps enumerated in the prison systems grievance procedure, regardless of whether he or she views the administrative procedure as futile.  *See Woodford v. Ngo*, 548 U.S. 81, 90 (2006).  A prisoner who begins the grievance process, but does not complete it has not exhausted his administrative remedies and is barred from bringing suit. *See Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir.2002).

The Denver Defendants have asserted failure to exhaust as a defense and therefore have the burden of proof in this regard.  They have provided evidence regarding the Jail's grievance procedures and an affidavit regarding Denver's records of grievances filed by Mr. Brodsky.  This evidence shows that Mr. Brodsky filed several grievances relating to the conditions at the Jail.  On August 27 and 29, 2009 he filed two grievances, specifically complaining about the noise

level in Building 9 and the deputies' use of the public address system, which he believed was too loud and used to make unnecessary announcements. On September 16, 2009, he also filed a grievance about the conditions in Building 8A, stating his general unhappiness about the size of the cell, the inadequate lighting, the lack of furnishings on which to sit, eat or read, the noise level from other inmates and radio/TV, his inability to participate in certain classes or worship services, the reduced access to the law library and outdoor exercise, delays in receiving his medication, and being housed with inmates who were charged with serious and violent crimes.

There is no record of a grievance with respect to the other bases of Mr. Brodsky's conditions of confinement claims, including the alleged inadequate food, overcrowding, poor ventilation and sanitation, danger from other inmates, lack of bedding, and conditions of the isolation unit. Based on this evidence, the Denver Defendants have carried a preliminary burden to show that Mr. Brodsky did not exhaust his claims based on these issues. The burden then shifts to Mr. Brodsky to show that he did exhaust his administrative remedies regarding these claims. Mr. Brodsky did not respond to the motion for summary judgment and therefore cannot carry his burden. Therefore, to the extent that the conditions of confinement claims are based on these factual premises, they are barred.

### 2.      Eighth Amendment - Conditions of Confinement

With respect to the merits of his constitutional claims, Mr. Brodsky bears the burden of proof. The relevant law as to the Eighth Amendment claims is set forth below.

Prison officials must "provide humane conditions of confinement by ensuring inmates receive the basic necessities of adequate food, clothing, shelter, and medical care and by taking reasonable measures to guarantee the inmates' safety." *Craig v. Eberly*, 164 F.3d 490, 495 (10th

Cir. 1998) (citations omitted).  To prevail on a "conditions of confinement" claim under the

Eighth Amendment, an inmate must establish that (1) the condition complained of is

"'sufficiently serious' " to implicate constitutional protection, and (2) prison officials acted with

"'deliberate indifference' to inmate health or safety."  *Farmer v. Brennan*, 511 U.S. 825, 834

(1994) (citations omitted).  In order to satisfy the first requirement, "the inmate must show that

he is incarcerated under conditions posing a substantial risk of serious harm."  *Id*.  Deliberate

indifference, the second requirement, "entails something more than mere negligence ... [but]

something less than acts or omissions for the very purpose of causing harm or with the

knowledge that harm will result."  *Id*. at 835.  This standard is equal to "recklessness," in which

"a person disregards a risk of harm of which he is aware."  *Id*. at 836-37.  "[T]he official must

both be aware of facts from which the inference could be drawn that a substantial risk of serious

harm exists, and he must also draw the inference."  *Id*. at 838.

    "While no single factor controls the outcome of these cases, the length of exposure to the

conditions is often of prime importance."  *DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir.

2001).  In this regard, "the severity and duration of deprivations are inversely proportional, so

that minor deprivations suffered for short periods would not rise to an Eighth Amendment

violation, while 'substantial deprivations of shelter, food, drinking water, and sanitation' may

meet the standard despite a shorter duration."  *Id*. (citations omitted).

### a.    Sufficiently Serious Condition

    As to Mr. Brodsky's exhausted claims (or claims that do not require exhaustion), the only

evidence he provides that might carry his burden to show a deprivation posing a substantial risk

of serious harm is his showing that he contracted tuberculosis due to the conditions in the Jail.[10]

His other asserted complaints are supported by only conclusory statements and will not suffice to

demonstrate a serious deprivation of the basic necessities of life.[11]  The deprivations identified

by Mr. Brodsky were generally short term or temporary and he provides no evidence to show

that they rose to a level posing a risk of serious harm.

To the extent the "soccer" ball incident, the comment by Deputy Burke, the purportedly

inappropriate classification, and the grievance system are construed to be Eighth Amendment

claims (perhaps on the grounds that the Denver Defendants failed to ensure Mr. Brodsky's safety

and comfort), none of these incidents or circumstances establish that Mr. Brodsky was exposed

to a risk of serious harm or that he suffered any harm.

### b.  Deliberate Indifference

Even assuming exposure to tuberculosis presents a serious risk of harm, Mr. Brodsky

must also carry his burden to show that the relevant decisionmakers were deliberately indifferent

to the risk of tuberculosis at the facility.  The evidence shows that Jail personnel were aware of

the risk from tuberculosis and took steps to mitigate it, including by testing all new inmates and

segregating those with the disease.  Mr. Brodsky offers no evidence that the decisionmakers at

---

[10]As noted by the Denver Defendants, Mr. Brodsky's evidence showing that he actually contracted tuberculosis at the Jail is not robust, but for the purposes of summary judgment the Court will construe his evidence in the light most favorable to him and assume that a reasonable jury could find in his favor as to causation.

[11]The evidence shows that Mr. Brodsky was provided clothing, housing, bedding, food, medical care, and measures were taken to ensure sanitation, even if it was not up to Mr. Brodsky's standards.  Despite his conclusory assertion that he was housed with violent and dangerous inmates, he offers no evidence in this regard or any showing of threat or risk from the other inmates.

the Jail were aware of any active cases of tuberculosis among the general population or that the

mitigation efforts were not effectively containing the disease.[12]  In short, he presents no evidence

sufficient to show that any responsible persons were aware of a risk of harm from the spread of

tuberculosis but failed to act despite that knowledge.[13]

Accordingly, summary judgment is granted in favor of the Denver Defendants and

against Mr. Brodsky on his Eighth Amendment conditions of confinement claims.

### 3.        First Amendment Retaliation

Mr. Brodsky has several claims that appear to be based on a First Amendment retaliation

theory, specifically that he was retaliated against because he filed grievances complaining about

his housing and other issues.  Government retaliation against a plaintiff for exercising his or her

First Amendment rights may be shown by proving the following elements: (1) that the plaintiff

was engaged in constitutionally protected activity; (2) that the defendant's actions caused the

plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to

engage in that activity; and (3) that the defendant's adverse action was substantially motivated as

a response to the plaintiff's exercise of constitutionally protected conduct.  *Shero v. City of

Grove*, 510 F.3d 1196, 1203 (10th Cir. 2007).

---

[12]Indeed, Mr. Brodsky has no evidence to show that the prevention and containment
protocol employed by the Jail was not working as he has not shown that anyone to whom he was
exposed actually had the disease.

[13]Even if the other bases for Mr. Brodsky's claim were not barred for failure to exhaust
or because he cannot show a sufficiently serious risk of harm, he similarly would not be able to
carry his burden to demonstrate that any prison officials were deliberately indifferent to any risk
to Mr. Brodsky from inadequate food or water, harm from other inmates, unsanitary conditions,
or other alleged deprivations.  He offers no evidence, other than allegations upon "information
and belief," regarding the decisionmakers' knowledge of the alleged deprivation or failure to act
despite such knowledge.

Mr. Brodsky has come forward with evidence sufficient for the first element of this claim in that filing grievances is conduct protected by the First Amendment.  *Gee v. Pacheco*, 627 F.3d 1178, 1189 (10th Cir. 2010).  He cannot, however, demonstrate that any defendant took action causing Mr. Brodsky to suffer an injury that would chill a person of ordinary firmness from exercising his right to file grievances.  The claimed retaliatory actions were reassignment to another housing unit and a search of his cell.  Neither of these actions demonstrate any injury to Mr. Brodsky.  There is no evidence that Building 8 was a punitive or segregation housing unit and, despite his conclusory assertions that he was denied privileges,[14] Mr. Brodsky offers no evidence to show that he did not receive these privileges due to his housing assignment rather than for some other reason, such as lack of availability or failure to sign up for classes or services.  Similarly, a search of a cell is an ordinary incident of prison life and the search caused Mr. Brodsky nothing more than some inconvenience.  Because Mr. Brodsky has not come forward with sufficient evidence to show a *prima facie* retaliation claim, summary judgment is granted in favor of Defendants.

**4.     First Amendment Petition Rights**

Mr. Brodsky's claim concerning the failure of Defendants Diggins and Lovingier to respond to his grievances is styled as a denial of his First Amendment right to petition the government for redress of grievances.  Mr. Brodsky provides no evidence that he was denied the

---

[14]To the extent Mr. Brodsky asserts unequal treatment or denial of his right to exercise his religion as a legal theory, he again provides nothing more than his own conclusory statements that he was denied participation in religious services.  The unrebutted evidence from the Denver Defendants is that religious services were offered and available to Mr. Brodsky assuming he signed up and there was space available.  Mr. Brodsky does not present evidence that he even signed up or attempted to sign up for services.

ability to file grievances, initiate litigation, or otherwise engage in activities involving his First

Amendment petition rights.  His only complaint is that these Defendants did not respond to his

grievances, which is insufficient to demonstrate a constitutional violation.  *See Walters v. Corr.*

*Corp. of Am.,* 119 Fed.Appx. 190, 191 (10th Cir.2004) ("When the claim underlying the

administrative grievance involves a constitutional right, the prisoner's right to petition the

government for redress is the right of access to the courts, which is not compromised by the

prison's refusal to entertain his grievance.") (quoting *Flick v. Alba*, 932 F.2d 728, 729 (8th

Cir.1991)).  Therefore, he cannot carry his burden in this regard and summary judgment is

granted on this claim.

### 5.    Due Process

Mr. Brodsky's claim regarding his classification appears to be based on his rights as

guaranteed by the Due Process clause of the Fourteenth Amendment.

A person alleging that he has been deprived of his right to procedural due process must

prove two elements: (1) that he possessed a constitutionally protected liberty or property interest;

and (2) that he was not afforded an appropriate level of process.  *Couture v. Board of Educ. of*

*Albuquerque Public Schools,* 535 F.3d 1243, 1257 (10th Cir. 2008).  As a matter of law, an

inmate has no liberty interest in discretionary classification decisions by prison officials.  *Gee v.*

*Pacheco*, 627 F.3d 1178, 1193 (10th Cir. 2010) (citing *Cardoso v. Calbone*, 490 F.3d 1194,

1197-98 (10th Cir.2007)).  In addition, an inmate does not have a liberty interest in his

conditions of confinement (including placement in isolation and segregation), unless the facts

show that the conditions "impose[ ] atypical and significant hardship on the inmate in relation to

the ordinary incidents of prison life."  *Id*. at 1193-94 (quoting *Sandin v. Conner*, 515 U.S. 472,

26

484 (1995)).

Other than a conclusory allegation that he was deprived of liberty or property, Mr. Brodsky presents no evidence showing a deprivation by virtue of his classification or housing assignment.  His general complaints about the other persons with whom he was housed and the conditions of his confinement do not suffice to carry his burden to show any deprivation, harm, injury, or conditions presenting atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

The only specific assertion in this regard is that Mr. Brodsky was placed in protective segregation after he reported that his inmate threatened him.  He does not offer any evidence, however, regarding the length of this housing assignment, the conditions, or any other factors that would demonstrate that he had an interest in not being placed in a protective assignment pending an investigation of an alleged threat.  Therefore, Mr. Brodsky's due process claim also fails as a matter of law.

### 6.	Supervisory and Entity Liability

Because Mr. Brodsky has not come forward with sufficient evidence to demonstrate any underlying constitutional violation, the Court need not address whether he can establish the additional elements required to impose liability on the supervisory or entity Defendants.

### 7.	State Law Claims

As discussed above, because Mr. Brodsky's federal law claims fail, only his state law claims asserted against these Defendants remain.  The Court again declines to exercise supplemental jurisdiction over Mr. Brodsky's state law claims and they are dismissed without prejudice to refiling in state court.

## VI.  Remaining Motions

**A.     Motion to Amend and Magistrate Judge's Recommendation**

Mr. Brodsky filed a Motion for Leave to file an Amended Complaint (**#114**) seeking to amend his Complaint in order to correct the names of several defendants and to add defendants and details to existing claims.[15]   The motion was referred to Magistrate Judge Michael E. Hegarty, who issued a Recommendation (**#145**) that the Motion be denied.  As grounds, the Recommendation notes that Defendant Lovingier has not been served and the proposed changes do not change the status quo in this regard.  The Recommendation also concludes that most of the proposed amendments do not materially change the substance of the claims but would cause Defendants prejudice because they have already filed dispositive motions.  The Recommendation finally concludes that adding new defendants would be futile because Mr. Brodsky's Eighth Amendment and supervisory liability claims would not survive summary judgment.

As discussed above, Mr. Brodsky has not come forward with evidence sufficient to show that he can carry his burden of proof with respect to the constitutional claims asserted his original Prisoner Complaint.  His proposed amendments would not save the claims; amendment would therefore be futile.  Accordingly, the Recommendation is accepted and Mr. Brodsky's

---

[15] The Magistrate Judge identifies the proposed amendments as follows: a) addition of Defendant Denver Health to Claim One; b) correction of Defendants' names in Claim Four to Gina McCall, Vicki Connors, and Anthony Petranilli (this change is more administrative than material for the latter two defendants); c) addition of Defendant Lawrence Austin in his supervisory capacity over John Doe I in Claim Five; d) identification of Defendants Carmen Kassatly, Francis J. Bauer, Lonnie McMurtery, Don Berg, Jack Park, Susan Crawford, and Kina Mosley, and addition of Defendants Lovingier and the City and County of Denver in Claim Six; e) addition of Defendant Diggins to Claim Nine; and f) limitation of Claim Ten to only Defendant Lovingier.

Motion for Leave to file an Amended Complaint is denied.

**B.** **Plaintiff Michael Brodsky's Objection (#86) to a Minute Order (#71) issued by the Magistrate Judge**

In a minute order, the Magistrate Judge denied Mr. Brodsky's request for a subpoena, through which Mr. Brodsky sought his health records from the CDOC showing his positive test for tuberculosis. Because Mr. Brodsky's claim fails on other grounds, there is no need for these documents and any error in this order is immaterial. Accordingly, the objections are overruled.

**IT IS THEREFORE ORDERED** that

(1)     Plaintiff Michael Brodsky's Objection (**#86**) to a Minute Order (**#71**) issued by the Magistrate Judge is **OVERRULED**.

(2)     The Motion for Summary Judgment (**#102**) filed by Defendants Denver Health and Hospital Authority, Carmen Kassatly, and Francis J. Bauer is **GRANTED IN PART AND DENIED WITHOUT PREJUDICE IN PART**. The motion is granted as to Mr. Brodsky's constitutional claims and denied without prejudice as to Mr. Brodsky's state law claims. The Court declines to exercise supplemental jurisdiction over the state law claims and so these are **DISMISSED WITHOUT PREJUDICE** to refiling in state court.

(3)     The Magistrate Judge's Recommendation (**#145**) is **ACCEPTED**. Therefore, Mr. Brodsky's Motion for Leave to file an Amended Complaint (**#114**) is **DENIED.**

(4)     The Hospital Defendants' Motion for Order to Show Cause Why Any Response Plaintiff Files to Motion for Summary Judgment Should Not Be Denied (**#117**) is **DENIED AS MOOT.**

29

(5)     The Hospital Defendants Second Motion for Summary Judgment (#**139**) is

        **DENIED AS MOOT.**

(6)     The Motion for Summary Judgment (#**141**) filed by Defendants City and County

        of Denver ("Denver"), D/S Diggins, V. Connors, D/S Austin, and D/S Petranilli is

        **GRANTED IN PART AND DENIED WITHOUT PREJUDICE IN PART**.

        The motion is granted as to Mr. Brodsky's constitutional claims and denied

        without prejudice as to Mr. Brodsky's state law claims.  The Court declines to

        exercise supplemental jurisdiction over the state law claims and so these are

        **DISMISSED WITHOUT PREJUDICE** to refiling in state court.

(7)     The Clerk shall enter judgment in favor of the Defendants and against Plaintiff on

        all constitutional claims.

(8)     The Motion to Strike Response to Motion (#**150**) is **DENIED AS MOOT**.

Dated this 19th day of October, 2011

                          **BY THE COURT:**

                          _Marcia S. Krieger_
                          _____

                          Marcia S. Krieger
                          United States District Judge